IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| MARY M. STRICKERT, individually, as Personal Representative of the Estate of Mark David Strickert, deceased, and as Personal Representative for the benefit of C.H.S. and C.S.S., <br><br>      Plaintiff, <br><br>  vs. <br><br>CHARLES C. NEAL; MOLOKINI DIVERS, INC.; NEALCO INTERNATIONAL LLC dba Scuba Shack in personam; and MOTOR VESSEL DOUBLE SCOOP, O.N. 1209721, its engines, equipment, and appurtenances, in rem, <br><br>      Defendants. | CIVIL NO. 14-00513 DKW-RLP <br><br>**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**ORDER DENYING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

This is a maritime wrongful death case arising out of a snorkeling accident

that occurred on July 20, 2014 near Molokini Crater, Maui as the decedent, Mark

Strickert, was snorkeling with his wife, Plaintiff Mary Strickert, and their two

minor children, C.H.S. and C.S.S., as customers of Defendants' dive tour business.

Plaintiff filed this action against Defendants Charles Neal, Molokini Dive Charters,

Inc. ("MDCI"), and NEALCO International, LLC dba Scuba Shack ("NEALCO"),

alleging claims of negligence (Count I) and gross negligence (Count II).

Before the Court is Defendants' Motion For Summary Judgment.  Dkt. No.

51.  Defendants argue that (1) Plaintiff's negligence claim is barred by a waiver

that Mr. Strickert signed prior to embarking on the snorkeling tour at Molokini;

and (2) Plaintiff's gross negligence claim fails because Plaintiff has not alleged

facts nor offered evidence establishing Defendants' requisite degree of culpability.

Because there are genuine issues of material fact as to both claims, the Court

DENIES Defendants' Motion for Summary Judgment.

## FACTUAL BACKGROUND

### I.    The Release Agreements

On the morning of July 20, 2014, the Strickerts boarded Defendants' vessel,

the Double Scoop, at the boat harbor in Kihei, Maui in order to participate in a

diving and snorkeling excursion.  Decl. of Charles Neal ("Neal Decl.").  Prior to

the excursion, Plaintiff and Mr. Strickert were provided a "PADI Discover Scuba

Diving Participant Statement," which included a section entitled, "Liability

Release and Assumption of Risk Agreement" (the "PADI DSD Release

Agreement"), which they both signed.  Neal Decl. Exhs. 1-2.  The PADI DSD

Release Agreement that was signed by Mr. Strickert provides, in relevant part:

I (participant name) Mark Strickert hereby affirm that I am aware that skin and scuba diving have inherent risks which may result in serious injury or death.

. . . .

I understand and agree that neither the dive professionals conducting this program, Jeff Bartunek, nor the facility through which this activity is conducted Scuba Shack, nor International PADI, Inc., nor any of their respective employees, officers, agents or assigns (hereinafter referred to as "Released Parties") may be held liable or responsible in any way for any injury death or damages to me, my family, estate, heirs or assigns that may occur as a result of my participation in this program or as a result of the negligence of any party, including the Released Parties, whether passive or active.

In consideration of being allowed to participate in this program, I hereby personally assume all risks for any harm, injury or damage, whether foreseen or unforeseen, that may befall me while participating in this program, including but not limited to the academics, confined water and/or open water activities.

I further release and hold harmless the Discover Scuba Diving program and the Released parties from any claim or lawsuit by me, my family, estate, heirs, or assigns arising out of my participation in this program.

I further understand that skin diving and scuba diving are physically strenuous activities and that I will be exerting myself during this program and that if I am injured as a result of heart attack, panic, hyperventilation, etc. that I expressly assume the risk of said injuries and that I will not hold the Released Parties responsible for the same.

I further state that I am of lawful age and legally competent to sign this Assumption of Risk and Liability Release Agreement, or that I have acquired the written consent of my parent or guardian.

3

> I understand that the terms herein are contractual and not a mere recital and that I have signed the Release of my own free act and with the knowledge that I hereby agree to waive my legal rights. I further agree that if any provision of this Agreement is found to be unenforceable or invalid, that provision shall be severed from this Agreement.  The remainder of this Agreement will then be construed as though the unenforceable provision had never been contained herein.
>
> I (participant name), Mark Strickert, BY THIS INSTRUMENT DO EXEMPT AND RELEASE THE DIVE PROFESSIONALS CONDUCTING THIS ACTIVITY, THE FACILITY THROUGH WHICH THIS ACTIVITY IS CONDUCTED, AND INTERNATIONAL PADI, INC., AND ALL RELATED ENTITIES AND RELEASED PARTIES AS DEFINED ABOVE, FROM ALL LIABILITY OR RESPONSIBILITY WHATSOEVER FOR PERSONAL INJURY, PROPERTY DAMAGE OR WRONGFUL DEATH, HOWEVER CAUSED, INCLUDING BUT NOT LIMITED TO THE NEGLIGENCE OF THE RELEASED PARTIES, WHETHER PASSIVE OR ACTIVE.

Neal Decl. Exh. 1.

In addition, Mr. Strickert signed on behalf of his son a separate form entitled, "Liability Release for Supervision of Certified Divers and Snorkelers" (hereinafter "Molokini Divers Release Agreement").  The Molokini Divers Release Agreement provides, in relevant part:

> This is a release of your rights to sue Molokini Divers, Inc., dba Scuba Shack, and its owners, employees, agents and assigns for personal injury or wrongful death that may occur during the forthcoming dive/snorkel activity as a result of the inherent risk associated with scuba diving and/or snorkeling or as a result of negligence.

Neal Decl. Exh. 1 (Dkt. No. 54-1 at 4).

4

Under the first paragraph referenced above, the Molokini Divers Release Agreement contains eleven enumerated sections and instructs participants to "[i]nitial each of the following sections as you read them.  If you do not scuba dive, initial only those items marked by the (*) symbol."  Dkt. No. 54-1 at 4 (brackets omitted).  The following five sections were marked by an asterisk and initialed by Mr. Strickert:

2.     I am aware of the risks inherent in scuba diving and/or snorkeling, as well as boat travel to and from the snorkel/dive sites, and I accept these risks.

3.     I affirm that I am in good mental and physical fitness for diving, snorkeling, and/or boat travel and that I am not under the influence of alcohol or drugs which are contra indicatory to scuba diving, snorkeling and/or boat travel.  If I am taking medication, I affirm that I have consulted a physician and have approval to scuba dive, snorkel, and/or travel on a boat while under the influence of medication.  If I am a non-swimmer or poor swimmer, I agree to wear a personal flotation device (PFD) at all times while on board a boat or in the water.  If I refuse to wear a PFD, I will be refused passage on the boat.

. . . .

6.     I will inspect all of my equipment prior to the activity and will notify the above listed business and/or an individual if any of my equipment is not working properly.  I will not hold the above listed businesses or individuals responsible for my failure to inspect my equipment prior to scuba diving or snorkeling.

7.     I acknowledge that I am physically fit to scuba dive, snorkel, and/or travel on a boat and I will not hold the above listed businesses or individuals responsible if I am injured as a

> result of heart, lung, ear, or circulatory problems or other
> illnesses that occur while scuba diving and/or snorkeling.
>
> . . . .
>
> 10.    I also understand that on this open water diving rip [sic],
> I will be at a remote site and there will not be immediate
> medical care or hyperbaric care available to me and I expressly
> assume the risk of diving and/or snorkeling in such a remote
> location.

Dkt. No. 54-1 at 4.

The eleventh section of the release, which did not contain an asterisk and was *not* initialed by Mark Strickert, provides:  "It is my intention by this instrument to exempt, release, and hold harmless Scuba Shack and all related entities as defined above from all liability whatsoever for personal injury, property damage, and wrongful death caused by negligence."  Dkt. No. 54-1 at 4.

## II.    **Mr. Strickert's Death**

Upon mooring at Molokini Crater, two of the Double Scoop's crew members led six passengers on a scuba dive, while all four Strickerts and two other passengers entered the water to snorkel.  Defendants' Concise Statements of Facts ("Def's CSF") ¶ 2.  Mr. Neal remained alone aboard the Double Scoop.  Def's CSF ¶ 2.  It is unclear the exact amount of time that elapsed, but at some point after the Double Scoop arrived at Molokini Crater, the weather worsened, causing extremely high wind and waves.  Def's CSF ¶ 3.  While the scuba divers and the snorkelers were in the water, a 50-knot squall blew into Molokini.  Plaintiff's

Concise Statement of facts ("Plf's CSF") ¶ 35.  All six scuba divers and the two crew members, Jeff Bartunek and Alana Osaki, made it back to the vessel safely. Def's CSF ¶ 4.  Of the snorkelers, Plaintiff, her daughter, and another passenger returned to the vessel safely.  Def's CSF ¶ 5.  However, Plaintiff's son and another snorkeler were not able to make it back to the vessel and became stranded on the rocks along the Molokini Crater shoreline.  Def's CSF ¶ 6.  Mr. Strickert was unable to make it to the rocks or back to the vessel, despite the efforts of Mr. Bartunek and Ms. Osaki.  Def's CSF ¶ 6.  Later that day, the Coast Guard recovered Mr. Strickert's body near the Molokini shoreline.  Def's CSF ¶¶ 8-9. The cause of Mr. Strickert's death was drowning.  Def's CSF ¶ 9.

## PROCEDURAL BACKGROUND

On November 13, 2014, Plaintiff filed a Complaint on behalf of herself, as personal representative of her late husband's estate, and as personal representative for the benefit of her two children, based on the events that transpired on July 20, 2014.  Dkt. No. 1.

Count I of the Complaint relating to negligence alleges, in relevant part:

> Mr. Neal, MDCI, NEALCO, the vessel, and each of them,
> negligently failed to use reasonable care to protect the safety of
> the passengers aboard the vessel that day, including but not
> limited to their failing to properly assess the weather
> conditions, failing to provide the vessel with an adequate
> number of crew to keep watch over the snorkelers while they
> were in the water and effect a rescue if necessary, failing to
> recognize the building danger in a timely manner and recall the

7

> scuba divers immediately, and in Mr. Neal failing to go into the
> water to effect a rescue when he had actual knowledge that Mr.
> Strickert was in danger of losing his life.

Dkt. No. 1 at 6.

Count II of the Complaint relating to gross negligence alleges that "[t]he misconduct of Mr. Neal, MDCI, and NEALCO, and each of them, was outrageous, wanton, and willful, in reckless indifference for the rights of others, and constituted an extreme departure from the applicable standard of conduct, which was motivated in whole or in part by desire for financial gain." Dkt. No. 1 at 7.

On September 21, 2015, Defendants filed their Motion for Summary Judgment. Dkt. No. 51. Plaintiff filed her Opposition on October 16, 2015 [Dkt. No. 56], and a Corrected Opposition on October 19, 2015 [Dkt. No. 59]. Defendants filed a Reply on October 22, 2015. Dkt. No. 63. The Court held a hearing on the motion on November 18, 2015.

## STANDARD OF REVIEW

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Thrifty Oil Co. v. Bank of Am. Nat'l*

*Trust & Sav. Ass'n*, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  Thus, the moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must set forth "'significant probative evidence'" in support of its position.  *T.W. Elec. Serv.*, 809 F.2d at 630 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).   "A party asserting that a fact cannot be or is genuinely disputed must support the assertion," and can do so by either "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

## I.   Application of Admiralty Jurisdiction

As a preliminary matter, the Court addresses both parties' contention that this Court has admiralty jurisdiction over this case.  Courts use a two-prong test to determine admiralty jurisdiction:

> Under the first prong, a court must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water.  Under the second prong, two issues are raised:  (1) whether the incident has a 'potentially disruptive impact on maritime commerce' (viewing the 'general features of the type of incident involved') and (2) whether the 'general character' of the 'activity giving rise to the incident' bears a 'substantial relationship to traditional maritime activity."

*McClenahan v. Paradise Cruises, Ltd.,* 888 F. Supp. 120, 121 (D. Haw. 1995) (quoting *Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532-34 (1995)).

As to the first prong, the incident at issue occurred in the ocean waters inside Molokini Crater, which are indisputably navigable.  As such, the jurisdictional query hinges on the second prong.  The second prong is satisfied "'when at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident.'"  *Id*. at 122 (quoting *Grubart*, 513 U.S at 541).  Here, the Complaint alleges, among other things, that the Defendants were negligent by:

> fail[ing] to use reasonable care to protect the safety of the passengers aboard the vessel that day, including but not limited to their failing to properly assess the weather conditions, failing to provide the vessel with an adequate number of crew to keep

10

watch over the snorkelers while they were in the water and effect a rescue if necessary, failing to recognize the building danger in a timely manner and recall the scuba divers immediately, and in Mr. NEAL failing to go into the water to effect a rescue when he had actual knowledge that MR. STRICKERT was in danger of losing his life.

Complaint ¶ 24.

The Complaint further alleges that "[a]s a direct, proximate and legal result of the aforesaid delicts of [Defendants], Mr. Strickert suffered severe emotional distress and conscious fear of impending death, severe physical pain and suffering, loss of life, loss of enjoyment of life, and other non-economic damages[.]"

Complaint ¶ 25.

As the parties themselves agree, these allegations are sufficient to satisfy the second prong because there is a nexus between traditional maritime activity and the incident at issue. *See, e.g.*, *In re Paradise Holdings, Inc.* 795 F.2d 756, 760 (9th Cir. 1986) (allegation that vessel collided with body-surfer established nexus with traditional maritime activity); *Sinclair v. Soniform*, 935 F.2d 599, 602 (3rd Cir. 1991) (holding that "the transport and care of passengers" aboard a dive boat during a scuba cruise "bears a substantial relationship to a traditional maritime activity"). As such, the Court determines that the application of admiralty jurisdiction is proper.

## II.    <u>Count I:  Negligence</u>

Defendants assert that they are entitled to judgment as a matter of law as to Count I because Mr. Strickert waived any negligence claims against them when he signed the PADI DSD Release Agreement prior to embarking on the excursion. Plaintiff asserts that the PADI DSD Release Agreement does not apply to snorkeling or, alternatively, is invalid under admiralty law and Hawai'i state law.

The threshold question is the scope of the PADI DSD Release Agreement. As explained further below, because there are questions of fact as to whether the scope of the PADI DSD Release Agreement covers the incident at issue, summary judgment is denied.[1]

## A.    The Scope of the PADI DSD Release Agreement[2]

Defendants base their waiver claim on certain provisions in the PADI DSD Release Agreement.  Plaintiff argues that the scope of the PADI DSD Release Agreement does not cover the incident at issue because Mr. Strickert was not participating in the Discover Scuba Diving program when the instant claims arose. As such, Plaintiff contends that the PADI DSD Release Agreement is inapplicable.

"In admiralty cases, the courts traditionally construe the language of exculpatory clauses strictly against the drafter." *In re Wechsler*, 121 F. Supp. 2d

---

[1]Based on this conclusion, the Court does not reach the question of whether the PADI DSD Release Agreement is invalid under admiralty law or Hawai'i law.

[2]Defendants concede that the PADI DSD Release Agreement and the Molokini Divers Release Agreement do not cover claims of gross negligence. *See* Dkt. No. 63 at 12.

404, 435 (D. Del. 2000).  Courts give full effect to exculpatory clauses only "[w]hen the contractual language is clear and unequivocal and plainly indicates the intentions of the parties[.]"  *Id.*  Contrary to Defendants' assertions, the PADI DSD Release Agreement does not unequivocally indicate that it covers the incident at issue.  Rather, there are several ambiguities as to its intent and scope, precluding summary judgment in favor of Defendants at this stage in the proceedings.

The PADI DSD Release Agreement provides in relevant part:

> I understand and agree that neither the dive professionals conducting this program, Jeff Bartunek, nor the facility through which this activity is conducted Scuba Shack, nor International PADI, Inc., nor any of their respective employees, officers, agents or assigns (hereinafter referred to as "Released Parties") may be held liable or responsible in any way for any injury death or damages to me, my family, estate, heirs or assigns that may occur *as a result of my participation in this program or as a result of the negligence of any party, including the Released Parties, whether passive or active*.

Neal Decl. Exh. 1 (emphasis added).

The parties dispute several provisions in the aforementioned paragraph. First, they dispute the meaning of the term "this program."  Plaintiff asserts that the term "this program" refers specifically to a Discover Scuba Diving program in which Mr. Strickert indisputably was *not* participating when the instant claims arose.  In support, Plaintiff points to the deposition testimony of Jeff Bartunek, who admitted that the Strickerts were not participating in a Discover Scuba Diving program when they were snorkeling at Molokini.  Decl. of John Hillsman

13

("Hillsman Decl.") Exh. 2.  Rather, it appears the Strickerts intended to participate in the Discover Scuba Diving program only at Turtle Town, a different location off the coast of Maui to which the Double Scoop was headed after leaving Molokini that morning.  Defendants contend that the use of the term "this program" is broad enough to encompass the snorkeling activity that Mr. Strickert was engaged in at the time of the incident, and thus, the PADI DSD Release Agreement bars Plaintiff's negligence claims.  Although snorkeling is not expressly mentioned anywhere in the PADI DSD Release Agreement, Defendants maintained at the hearing that snorkeling is similar to scuba diving and skin diving, which are expressly mentioned.  Defendants' position, however, raises the question of whether snorkeling is similar enough to scuba diving and skin diving to be encompassed by the PADI DSD Release Agreement.  The Court concludes that this is a question of fact.[3]

---

[3] The Court notes that the Molokini Divers Release Agreement, which defense counsel confirmed at the hearing was not signed by Mr. Strickert on behalf of himself, but rather on behalf of his son, does expressly mention snorkeling.  The presence of the two waivers, the PADI DSD Release Agreement and the Molokini Divers Release Agreement, also raises questions regarding whether Defendants considered snorkeling and scuba diving as the same activity.  Indeed, the Defendants saw fit to expressly include snorkeling and scuba diving as distinct activities in the Molokini Divers Release Agreement.

The Court further notes that Mr. Strickert did not initial the paragraph of the Molokini Divers Release Agreement stating:  "It is my intention by this instrument to exempt, release, and hold harmless Scuba Shack and all related entities as defined above from all liability whatsoever for personal injury, property damage, and wrongful death caused by negligence."  Dkt. No. 54-1 at 4.  The absence of Mr. Strickert's initial next to this paragraph cuts against Defendants' argument that Mr. Strickert clearly intended to release Defendants from all liability for personal injury and wrongful death caused by Defendants' negligence.

Second, there is also ambiguity in the portion of the PADI DSD Release
Agreement releasing Defendants from any injury or damages "as a result of the
negligence of any party, including the Released Parties, whether passive or active."
Defendants wish to read this portion of a single clause outside the context of the
entirety of the form.  However, "[b]asic principles in the common law of contracts
readily apply in the maritime context."  *Clevo Co. v. Hency Transp., Inc.*, 715 F.3d
1189, 1194 (9th Cir. 2013).  The Ninth Circuit looks to the Restatement (Second)
of Contracts as a source for general contract principles.  *See id.*  In resolving the
question of whether terms in a contract are ambiguous, a court may not view the
particular terms in a vacuum.  *See* Restatement (Second) of Contracts § 202(2) ("A
writing is interpreted as a whole, and all writings that are part of the same
transaction are interpreted together.").  Rather, a court must view the terms in the
context of the entire integrated agreement.  *See id.; see also Klamath Water Users
Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("A written
contract must be read as a whole and every part interpreted with reference to the
whole, with preference given to reasonable interpretations.").  Here, the context of
the entire form suggests that the clause Defendants cite applies solely to the
Discover Scuba Diving Program.  The title of the form, "PADI Discover Scuba
Diving Participant Statement" strongly supports this view, as do the numerous
references throughout the document to the "PADI Discover Scuba Diving

15

program," "the program," and, more generally, to scuba diving.  When the terms at issue are viewed in this light, their exact meaning is, at best, ambiguous, insofar as they relate to Mr. Strickert's activities at Molokini.

In sum, the application or even relevance of the PADI DSD Release Agreement to the instant event on July 20, 2014 raises questions of fact that preclude summary judgment.  Accordingly, Defendants' Motion for Summary Judgment as to Count I is denied.

## III.   Count II:  Gross Negligence

Defendants contend that they are entitled to judgment as a matter of law on Plaintiff's claim of gross negligence because Plaintiff failed to allege facts or produce evidence establishing the higher degree of culpability associated with that theory.  In response, Plaintiff contends that she has put forward sufficient allegations and evidence creating, at the very least, a genuine issue of material fact. Alternatively, Plaintiff requests that the Court defer or deny Defendants' motion under Fed. R. Civ. P. 56(d), as Plaintiff has not had the opportunity to depose relevant witnesses, including Mr. Neal.  The Court concludes that the allegations in the Complaint, coupled with the depositions and declarations provided by Plaintiff, are sufficient to survive a motion for summary judgment.

Because the Court's jurisdiction is grounded in admiralty, the Court "look[s] to common law in considering maritime torts." *Royal Ins. Co. of America v.*

*Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999).  Gross negligence requires "'the intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.'" *Id.* (quoting Black's Law Dictionary 1185 (4th ed. 1968)); *see also Pancakes of Haw., Inc. v. Pomare Props. Corp.*, 85 Hawai'i 286, 293, 944 P.2d 83, 90 (App. 1997) (noting that gross negligence has been defined as "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected" (citation and quotation signals omitted)).  It is also recognized that gross negligence "is simply a point on a continuum or probability, and its presence depends on the particular circumstances of each case." *Royal Ins. Co. of Am.*, 194 F.3d at 1015 (citation and quotation signals omitted); *see also Pancakes of Hawai'i, Inc.*, 85 Hawai'i at 293, 944 P.2d at 90 ("The element of culpability that characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence." (quotations signals and alterations omitted)).

In the instant case, the Complaint alleges in relevant part:

> 14. Weather and sea conditions worsened and Mr. Neal began waving at the snorkelers to return to the vessel.  Mrs. Strickert and her daughter [C.H.S.], who were snorkeling together, were able to make their way back to the vessel and re-board it, although with difficulty due to sea conditions.

17

15. Mr. Strickert and his son [C.S.S.], who were snorkeling together, were not able to make their way back to the vessel.

16. After they re-boarded the vessel, Mrs. Strickert and her daughter could see Mr. Strickert and [C.S.S.] in distress waving for help, along with another snorkeler, a lady named Jennifer, who was near them.

17. *Mr. Neal could also see the three snorkelers in trouble in the water, waiving for help.*

18. *Mrs. Strickert repeatedly asked Mr. Neal to go into the water to help them, but he would not go, saying he could not go get them until the scuba divers were up*.

19. As Mrs. Strickert and her daughter watched, her son [C.S.S.] was swept by a large wave toward some rocks. *She pleaded with Mr. Neal to help him and her husband. Mr. Neal would not respond.*

20. Mrs. Strickert then saw her son scramble up onto the rocks, saw Jennifer near the rocks trying to get up on them, but she lost sight of her husband. *Mrs. Strickert again pleaded with Mr. Neal to go into the water to find her husband and help him, as did her daughter  [C.H.S.]. Mr. Neal watched and did nothing*.

21. Several minutes later, Mr. Neal began banging on the hull of the vessel with a weight to signal the divers to return to the vessel.  A few minutes after that, the divers began returning to the vessel.

22. When the two crew members surfaced and heard what had happened, they began hurrying all the divers to get back aboard. After the divers were all back aboard, one of the crew members went to the rocks where Mrs. Strickert's son [C.S.S.] and Jennifer were waiting for help.

23. Mrs. Strickert continued to plead with Mr. Neal to look for her husband and help him.  At this point, after the crewman in

the water made a signal to Mr. Neal indicating that someone was dead, Mr. Neal called the U.S. Coast Guard.  After a Coast Guard vessel arrived, Mr. Strickert's body was recovered by Coast Guard personnel and taken ashore, where he was pronounced dead.

Complaint ¶¶ 14-23 (emphases added).

The Court first concludes that the foregoing allegations are sufficient to survive summary judgment because they at the very least raise a triable as to whether Mr. Neal's conduct falls within the definition of "gross negligence."  The allegations that Mr. Neal was aware that Mr. Strickert was visibly in distress in the open ocean and that despite Plaintiff's repeated pleas to Mr. Neal to assist her husband, Mr. Neal, for at least several minutes, stood and "did nothing" to assist Mr. Strickert suggest an "[i]ndifference to a present legal duty and utter forgetfulness of legal obligations so far as other persons may be affected." *Pancakes of Hawai'i, Inc.*, 85 Hawai'i at 293, 944 P.2d at 90.  The Court further concludes that the circumstances surrounding Mr. Strickert's death as alleged in the Complaint are sufficient to raise a triable issue as to causation.

Second, the Court concludes that Plaintiff has put forward sufficient evidence to support her allegations of gross negligence.  Plaintiff's deposition testimony closely mirrors the allegations in the Complaint.  Specifically, Plaintiff testified that when she saw her husband, her son, and a third snorkeler in the water waiving, she "told Mr. Neal that something must be wrong and he needed to go get

them." Exh. 1 at 104:13-105:3.  However, "[Mr. Neal] didn't say anything" or do

anything in response.  Exh. 1 at 105:5.  The conditions at that time consisted of

pouring rain, rough water, and big waves.  Exh. 1 at 105:6-9.  Plaintiff testified that

Mr. Neal simply stood there for "several minutes" before he eventually banged on

the boat, signaling the scuba divers to surface.  Exh. 1 at 113:16-114:24.

In addition, Plaintiff's two experts support the conclusion that a reasonable

trier-of-fact could determine that Defendants were grossly negligent.  Professor

Margaret McManus, a professor of Oceanography at the University of Hawai'i,

reviewed the available weather data for the days preceding the date of the incident.

Declaration of Margaret McManus ("McManus Decl.") at ¶¶ 2, 8-15.  After

highlighting several National Weather Service ("NWS") announcements that were

issued, Professor McManus opined that "[n]o reasonably prudent mariner,

exercising even scant care, would have considered departing Kihei harbor in a

small vessel like *Double Scoop* on the morning of July 20, 2014, much less taken a

group of passengers for hire on a snorkel-and-dive trip to Molokini, without

monitoring those NWS announcements."  McManus Decl. at ¶¶ 15-16.[4]  Captain

Bret Gilliam, a licensed mariner and a 44-year veteran of the professional diving

---

[4]The Court concludes, contrary to Defendants' contention, that Professor McManus is qualified to render this opinion based on her knowledge, skill, experience, training, and education, which includes having "participated in 40 expeditions, with over 400 days in the marine environment[,]" and being "regularly called upon to consider the weather when planning or conducting expeditions in the marine environment."  McManus Decl. at ¶¶ 2, 6.  Defendants may, of course, challenge Professor McManus' expertise and conclusions at trial.

industry, outlined in his declaration how he believed Defendants' conduct

"constituted an extreme departure from ordinary, industry-wide standards of care

and were a direct and proximate cause of [Mr. Strickert's] death." Declaration of

Bret Gilliam ("Gilliam Decl.") at ¶ 11.  For example, Captain Gilliam opined:

> [Captain Neal] failed to utterly respond to the emergency that developed when the squall blew into Molokini, and instead stood inertly on the deck of his vessel for several unforgiving minutes, while three imperiled passengers waived and called for help from the water, *when any prudent operator, exercising even scant care, would have recalled all the scuba divers at the first sign of trouble, and directed his two crew members to drop their gear in the water, and go to the immediate aid of the snorkelers.*

Gilliam Decl. at ¶ 11 (emphasis added).

"In this circuit, expert opinion is admissible and may defeat summary

judgment if it appears that the affiant is competent to give an expert opinion and

the factual basis for the opinion is stated in the affidavit, even though the

underlying factual details and reasoning upon which the opinion is based are not."

*Walton v. U.S. Marshals Service*, 492 F.3d 998, 1008 (9th Cir. 2007) (internal

brackets, quotations marks, and citation omitted).  The opinions of Professor

McManus and Captain Gilliam satisfy this standard.  Drawing all inferences in

favor of Plaintiff, a jury could reasonably conclude that Mr. Neal's decision to

proceed with the scuba-and-snorkeling excursion on July 20, 2014 despite the

NWS announcements, and his failure to immediately respond to the snorkelers,

including the decedent, who were in visible distress, displayed "'such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.'" *Royal Ins. Co. of Am.*, 194 F.3d at 1015 (quoting Black's Law Dictionary 1185 (4th ed. 1968)).

In sum, because both the allegations and evidence raise triable issues of fact as to whether Defendants were grossly negligent, Defendants' Motion for Summary Judgment as to Count II is denied .

## CONCLUSION

The Court hereby DENIES Defendants' Motion for Summary Judgment (Dkt. No. 51).

IT IS SO ORDERED.

DATED:  November 30, 2015 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

Strickert v. Neal; CV 14-00513 DKW-RLP; ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT